*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* BRANNOCK/VANBLARICUM, Minors.

UNPUBLISHED
December 09, 2025
3:05 PM

No.  373399
Oakland Circuit Court
Family Division
LC No.  17-854809-NA

*In re* VANBLARICUM, Minors.

No.  373462
Oakland Circuit Court
Family Division
LC No.  17-854809-NA

Before:  YATES, P.J., and BOONSTRA and YOUNG, JJ.

PER CURIAM.

In Docket No. 373399, respondent-mother appeals by right the trial court's order terminating her parental rights to her minor children, AB, TV, CV, and JV.  In Docket No. 373462, respondent-father appeals by right the trial court's order terminating his parental rights to TV, CV, and JV.[1]  We affirm.

## I.  PERTINENT FACTS AND PROCEDURAL HISTORY

Respondents have three children together: TV, CV, and JV.  Respondents' youngest child, JV, was born during the lower court proceedings.  Respondent-mother's oldest son, AB, is from a

---

[1]  On December 11, 2024, this Court consolidated these appeals on its own motion.  *In re Brannock/VanBlaricum*, unpublished order of the Court of Appeals, entered December 11, 2024 (Docket Nos. 373399 and 373462).

prior relationship; his father, G. Brannock, was not a respondent in the proceedings below and is not a party to these appeals. Although the proceedings below were initiated by a petition filed by the Department of Health and Human Services (DHHS or petitioner) related to events that occurred in the summer of 2022, respondents have a history of Children's Protective Services (CPS) involvement.[2] In 2017, AB was removed from respondent-mother's care following a CPS investigation that substantiated allegations of improper supervision and threatened harm. DHHS offered respondent-mother a treatment plan and services. In mid-2018, while AB was still in care, respondent-mother gave birth to TV. Because respondent-mother was still participating in services and had yet to show any benefit, TV was also removed from respondents' care. In 2019, the trial court terminated its jurisdiction and returned AB and TV to respondents' care.

In early 2020, respondent-mother gave birth to CV. In the summer of 2022, respondents lived together with AB, TV, and CV in a trailer located in Oakland County. On August 21, 2022, AB, then seven years old, choked on a biscuit. He stopped breathing and eventually experienced cardiac arrest. Respondents called 911 and emergency medical services were dispatched to the home. Paramedics were eventually able to remove the airway obstruction and revive AB. Medical providers and police who responded to the 911 call noted that the condition of respondents' home was extremely poor: in every room of the home, surfaces were covered in human and animal feces, mildew, and mold; there were piles of dirty diapers, garbage, and rotting food throughout the home, and the home smelled overwhelmingly bad. Law enforcement officers who returned to the home to execute a search warrant were forced to wear protective biohazard equipment.

AB was transported to a hospital in Novi and subsequently transferred to Mott Children's Hospital (MCH) in Ann Arbor. At MCH, medical staff noticed severe bruising all over AB's body. After further testing and examination, Dr. Bethany Mohr, Medical Director of the Michigan Medicine Child Protection Team, concluded that AB had been physically abused.

Upon AB's arrival at MCH, respondent-mother impeded his treatment, refused to allow hospital staff to provide physical therapy, and refused to consent to outpatient speech therapy. Similarly, respondent-father's mother, i.e., AB's stepgrandmother, C. Reblin, interfered when hospital staff asked AB about his injuries.

On August 23, 2022, DHHS filed a petition in Washtenaw Circuit Court seeking AB's removal from respondents' care. AB was the only child identified in the petition. At the August 26, 2022 preliminary hearing, the parties waived probable cause and the court authorized the petition. The court also placed AB with Brannock, his legal and biological father, but granted respondent-mother supervised parenting time. In addition, the court ordered that respondent-father, Reblin, and respondent-father's grandmother, G. VanBlaricum, have no contact with AB. The Washtenaw Circuit Court also transferred the matter to the Oakland Circuit Court.

---

[2] Because child protective proceedings are deemed single continuous actions, *In re LaFlure*, 48 Mich App 377, 391; 210 NW2d 482 (1973), and "[h]ow a parent treats one child is certainly probative of how that parent may treat other children," *In re LaFrance*, 306 Mich App 713, 730; 858 NW2d 143 (2014), a brief review of the family's entire CPS history is warranted.

On September 13, 2022, AB disclosed during a forensic interview that he had been repeatedly physically abused by respondent-father and that respondent-mother was present during the abuse. This abuse included being beaten with a belt or a piece of wood. AB also stated that respondent-mother, TV, and CV were often present during the abuse. On September 15, 2022, DHHS filed a first-amended petition that sought the removal of AB, TV, and CV, and identified both respondent-father and respondent-mother as respondents.

On September 16, 2022, respondents were both arrested on child abuse charges and held in the Oakland County Jail. Because this left TV and CV without proper care and custody, the court entered an interim placement order permitting DHHS to take the children into protective custody. Thereafter, TV and CV were placed together in a nonrelative licensed foster home. After several adjournments, the court held a preliminary hearing on October 4, 2022 and authorized the first-amended petition.

On October 17, 2022, DHHS filed a second-amended petition requesting that the court authorize the petition, take jurisdiction over the children, terminate respondent-mother's parental rights to AB, and terminate both respondents' parental rights to TV and CV. In addition to allegations related to respondent-father's physical abuse of AB, and respondent-mother's failure to protect AB, the second-amended complaint included allegations that the children were subjected to extreme environmental neglect. DHHS alleged that the condition of respondents' home was deplorable. After respondent-mother gave birth to JV in mid-2023, the petition was amended again to include a request that the court also terminate respondents' parental rights to JV.

In the months that followed, the trial court adjourned the pretrial hearings, and consequently the jurisdictional trial, on several occasions, for various reasons, including delays related to respondents' criminal charges, the production of medical records, the birth of JV, the filing of an amended petition, and the substitution of appointed counsel. While the matter awaited adjudication, the court held hearings at regular three- to four-month intervals.

In May 2023, respondent-mother entered a no-contest plea to one count of fourth-degree child abuse and was released from jail; she was eventually sentenced to time served. After her release, respondent-mother immediately moved to Florida to live with her parents. In January 2024, respondent-father pleaded no contest to one count of second-degree child abuse and was sentenced to 7 to 15 years' imprisonment. Respondent-father's earliest possible release date is September 15, 2029.

The trial court held a combined jurisdictional trial and statutory grounds hearing in late August 2024. At the conclusion of the proceeding, the trial court found that the children came within its jurisdiction, and that clear and convincing evidence had been presented supporting the termination of respondents' rights to each of their children under MCL 712A.19b(3)(g), (j), and (k)(*iii*). At the conclusion of a best-interest hearing in September 2024, the trial court found that termination of respondents' parental rights was in each child's best interest, and accordingly entered an order terminating respondents' parental rights. These appeals followed.

## II. RESPONDENT MOTHER'S APPEAL (DOCKET NO. 373399)

### A. STATUTORY GROUNDS

Respondent-mother argues that the trial court erred by finding that statutory grounds for terminating her parental rights were established by clear and convincing evidence. We disagree. To terminate parental rights, the trial court must find that at least one of the statutory grounds for termination has been established by clear and convincing evidence. *In re Trejo*, 462 Mich 341, 355; 612 NW2d 407 (2000). This Court reviews the trial court's findings for clear error. MCR 3.977(K). A finding is clearly erroneous if the reviewing court is left with a definite and firm conviction that a mistake has been committed. *In re Mason*, 486 Mich 142, 152; 782 NW2d 747 (2010), citing *In re Miller*, 433 Mich 331, 337; 445 NW2d 161 (1989).

The trial court terminated respondent-mother's parental rights under MCL 712A.19b(3)(g), (j), and (k)(*iii*), which permit termination of parental rights under the following circumstances:

> (g) The parent, although, in the court's discretion, financially able to do so, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.

> * * *

> (j) There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if the child is returned to the home of the parent.

> (k) The parent abused the child or a sibling of the child, the abuse included 1 or more of the following, and there is a reasonable likelihood that the child will be harmed if returned to the care of the parent:

> * * *

> (*iii*) Battering, torture, or other severe physical abuse.

We conclude that the trial court did not clearly err when it terminated respondent-mother's parental rights on these grounds.

Respondent-mother's only argument is that the trial court erred when it found statutory grounds to terminate her parental rights, because there was no evidence implicating her in any abuse of the children. Respondent-mother's argument is belied by the extensive record in this case, and is devoid of legal merit. Contrary to respondent-mother's argument, it was not necessary for DHHS to establish that she herself had physically abused her children. In *In re Ellis*, 294 Mich App 30, 35-36; 817 NW2d 111 (2011), this Court held that termination of parental rights under MCL 712A.19b(3)(j) and (k)(*iii*), as well as under MCL 712A.19b(3)(b)(*i*) and (b)(*ii*), was permissible even in the absence of definitive evidence regarding the identity of the abuse perpetrator "when the evidence does show that respondent or respondents must have either caused

-4-

or failed to prevent the child's injuries." In this case, there was clear and convincing evidence that respondent-mother knew that respondent-father was physically and emotionally abusing AB, yet she failed to prevent AB's injuries. In fact, respondent-mother admitted as much at the termination hearing. Similarly, respondent-mother was aware that TV and CV were being emotionally abused by respondent-father's actions, yet she failed to protect them from this abuse.

The evidence presented to the trial court established that AB was the victim of severe physical abuse. Two first responders, a triage nurse, and Dr. Mohr testified that AB had significant bruising and abrasions over his chest, back, arms, legs, face, and scalp. AB also had patches of hair missing and a chipped front tooth. AB's X-rays showed a healing fracture of his right pelvic girdle. Some of the injuries were "patterned," suggesting that AB had been struck with an object. Other injuries were in locations that would be atypical for injuries associated with normal childhood accidents.

Dr. Mohr testified that there was no evidence that AB suffered from a bleeding or clotting disorder that would explain the extensive bruising. Further, neither respondent offered a plausible explanation for AB's injuries. Dr. Mohr found the number of injuries alarming, and she opined, based on the extensive injuries and totality of the circumstances, that AB's injuries were the result of physical abuse.

There was also clear and convincing evidence from which the court could conclude that respondent-mother knew about the abuse yet failed to protect her child. AB had disclosed that respondent-mother and his two younger siblings were present during his abuse by respondent-father. Respondent-mother admitted that she saw respondent-father on multiple occasions repeatedly strike AB with either a belt, hose, or piece of wood, and that these assaults caused AB to suffer bruises and bleeding gashes on his skin. She also saw respondent-father violently kick AB in his hip while wearing steel-toed boots. On several occasions, respondent-mother witnessed respondent-father drag AB across the floor by his hair. Respondent-mother admitted that she stood by while respondent-father forced AB to stand under a cold shower for 20 to 30 minutes, stand in a corner for an entire day, and go without food. Indeed, respondent-mother admitted that she similarly disciplined AB by withholding food and making him stand in a corner for hours. On one occasion, respondent-father held AB down on a bed by placing his knee on the child's stomach. Respondent-mother thought AB had lost consciousness as a result of that abuse, yet she failed to obtain any medical care for her child.

Moreover, not only did respondent-mother fail to intervene to stop the abuse, there was evidence that respondent-mother was complicit in the abuse and neglect. Respondent-mother kept AB out of school in an effort to conceal the abuse. When school resource officers conducted welfare checks, respondent-mother was hostile and uncooperative. She failed to ask for help or disclose what was going on in the home. Even when AB almost died from choking on a biscuit, and the existence of the injuries was finally revealed, respondent-mother did not cooperate with the medical professionals. Instead, respondent-mother was hostile, and she refused to provide a history that would have aided in AB's diagnosis and treatment.

Respondent-mother admitted that she had not intervened when respondent-father physically and emotionally abused AB. She further acknowledged that the abuse occurred in front of TV and CV. There was evidence that these younger children were emotionally traumatized by

-5-

what they saw and heard. AB stated that CV was scared during his abuse, and that she would cry and run away. The worker supervising the parenting-time video visits noted that the children appeared scared, nervous, and anxious during visits with respondent-father. The trial court did not clearly err by concluding that clear and convincing evidence showed respondent-father had emotionally abused CV and TV, that these children were emotionally injured by respondent-father's actions, and that respondent-mother failed to protect them from this abuse.

In addition to the physical and emotional abuse, there was also clear and convincing evidence of severe environmental neglect of AB, CV, and TV. The record establishes that respondents and the children lived in complete and utter squalor. Every room in the family's trailer was uninhabitable. Floors and other surfaces were covered in human and animal feces, mildew, and mold. The odor in the home was overwhelming. Trash was strewn about, and soiled diapers were found everyway. Rotting and mold-covered food was found throughout the trailer. The carpets, walls, beds, and floors were stained. Respondent-mother claimed that the home had only reached such a condition *after* the children were removed from her care. However, the trial court found that respondent-mother's testimony was not credible, in light of testimony from various first responders who observed the home in August 2022 (before the children were removed) and described it as unsanitary and unfit for children.

Regarding the termination of respondent-mother's rights to JV, there was clear and convincing evidence to support the conclusion that JV would be neglected if returned to respondent-mother's care. See MCL 712A.19b(3)(j) and (k)(*iii*); how a parent treats one child is often probative of how that parent will treat other children. *Mason*, 486 Mich at 161; *In re Kellogg*, 331 Mich App 249, 259; 952 NW2d 544 (2020). JV was born during the lower court proceedings and immediately removed from respondents' care. Outside the time they were together in the hospital at the birth, JV never lived with respondent-mother. Nevertheless, the trial court did not err by applying the anticipatory neglect doctrine and concluding that JV would be harmed if returned to respondent-mother's care. *Kellogg*, 331 Mich App at 259.

The evidence established that respondent-mother allowed respondent-father to severely physically abuse a child in the home, exposed other children in the home to the violent assaults, and severely neglected the children by permitting them to live in almost unimaginable filth. In addition, respondent-mother was complicit in keeping respondent-father's abuse from being discovered, and failed to cooperate with the investigation and medical treatment when the abuse of AB came to light. From this record, the trial court did not clearly err by concluding that the children would be harmed if returned to respondent-mother's care and custody, warranting the termination of her parental rights. *Trejo*, 462 Mich at 355; *Mason*, 486 Mich at 161.

## B. BEST-INTEREST DETERMINATION

Respondent-mother also argues that the trial court erred by holding that the termination of her parental rights was in the children's best interests. We disagree. Whether termination of parental rights is in a child's best interests must be proven by a preponderance of the evidence. *In re Moss*, 301 Mich App 76, 90; 836 NW2d 182 (2013). This Court reviews for clear error a trial court's finding that termination of parental rights is in a child's best interests. *In re Jones*, 286 Mich App 126, 129; 777 NW2d 728 (2009).

"If the court finds that there are grounds for termination of parental rights and that termination of parental rights is in the child's best interests, the court shall order termination of the parental rights and order that additional efforts for reunification of the child with the parent not be made." MCL 712A.19b(5). When considering whether termination of parental rights is in a child's best interests, a court may consider a variety of factors. *In re White*, 303 Mich App 701, 713; 846 NW2d 61 (2014). These factors include the bond between the child and the parent, the parent's ability to parent the child, the child's need for permanency and stability, the advantages of a foster home over the parent's home, the parent's compliance with the case service plan, the parent's visitation history with the child, the child's well-being, and the possibility of adoption. *Id.* at 713-714. In addition, the trial court should consider the child's safety, including the risk of harm a child might face if returned to the parent's care. See *In re VanDalen*, 293 Mich App 120, 142; 809 NW2d 412 (2011). The court may also consider psychological evaluations, the child's age, continued involvement in domestic violence, and a parent's history. *Jones*, 286 Mich App at 131.

"The trial court should weigh all the evidence available to determine the children's best interests." *White*, 303 Mich App at 713. The court's focus must be on the child and not the parent. *Moss*, 301 Mich App at 87. When more than one child is involved, a trial court must consider each child's best interests separately. *Olive/Metts*, 297 Mich App at 42. A trial court need not, however, make "individual" and "redundant factual findings" if the children's interests do not significantly differ. *White*, 303 Mich App at 715-716. Further, in the majority of cases, it is in a child's best interests to be placed with his or her siblings. *Olive/Metts*, 297 Mich App at 41-42.

In this case, although all of the children shared many of the same interests, they were not similarly situated for purposes of a best-interest analysis. Approximately eight years separated AB from his youngest half-sibling. AB was placed with his biological father, while his three half-siblings were placed together in a nonrelative licensed foster home. Although the trial court recognized that there were common elements pertinent to evaluating the best interests of the children, it also recognized the need for individual best-interest determinations and explicitly considered the best interests of the children individually.

## 1. AB's BEST INTERESTS

AB, respondent-mother's oldest child, was nine years old at the time of termination. His situation differed from his half-siblings in several respects. After he was removed from respondent-mother's home, he was placed with Brannock, his biological father. Further, AB was the only child who had been severely physically abused while in respondent-mother's care. It is clear from the evidence in the record that these experiences had taken their toll on AB. AB struggled with anger management and behavioral issues. At the time of termination, AB had just started at a new school that was better able to address and manage his mental health issues. The caseworker testified that although it had not been an easy transition, Brannock was providing for AB's needs. The caseworker had no concerns over the placement. AB had a strong bond with Brannock, and he felt comfortable talking and playing with his father. AB was meeting all of his developmental benchmarks, and Brannock was ensuring that AB attended school and scheduled dental and medical appointments. Brannock met all of AB's needs, and he provided AB with a stable home environment. It was evident that AB was in desperate need of this stability and permanence.

By contrast, there was no evidence that respondent-mother could meet AB's needs and provide him with stability and permanence. AB required a parent who would ensure that he attended school, participated in therapy, and complied with his medication regime. Respondent-mother's track record in this regard was poor. When the children were in her care, respondent-mother did not enroll AB in school for at least two school years; when he was enrolled in 2021, respondent-mother admitted that respondents later removed him from school because of concerns that he would disclose respondent-father's abuse. Further, respondent-mother had not achieved the stability required to parent her children. At the time of termination, respondent-mother was unemployed and living with her parents in their Florida home. Respondent-mother admitted at the best-interest hearing that if her father were to ask her to leave his home tomorrow, she honestly had no idea what she would do. The record shows clearly that respondent-mother had yet to achieve the stability and independence required to take care of herself, let alone a child.

Additionally, the evidence supported the trial court's finding that no bond existed between respondent-mother and AB. Respondent-mother admitted that she only had a slight bond with AB. Respondent-mother never asked the caseworker about her son. Similarly, AB never asked about his mother. When the caseworker attempted to speak with AB about his mother, he would not respond. In fact, AB's refusal to talk in therapy initially impeded his progress. The record contains overwhelming evidence that AB was betrayed by a person who was supposed to love and protect him. Instead of acting in her child's best interests, respondent-mother allowed her husband to severely and persistently physically and emotionally abuse her son in ways that could accurately be described as "torture." AB was clearly aware of this betrayal and never displayed even a hint of desire to be reunited with respondent-mother.

The trial court also considered the fact that AB was placed with his biological father. Recently, this Court determined that a minor child's placement with a biological parent at the time of the termination hearing must be considered in determining whether it is in child's best interests to terminate a respondent's parental rights. See *In re Boshell/Shelton*, ___ Mich App ___, ___; ___ NW3d ___ (2025) (Docket No. 371973); slip op at 10-11. Relative placement is a factor that weighs against termination. *Olive/Metts*, 297 Mich App at 41-42. This is so because a relative caretaker may be open to allowing the parent to maintain a relationship with the child, and maintenance of that relationship may be in the child's best interests. *Mason*, 486 Mich at 168-169. However, while placement with a relative weighs against termination, it is not dispositive because a trial court "may terminate parental rights in lieu of placement with relative if it finds that termination is in the child's best interests." *Olive/Metts*, 297 Mich App at 41-42.

In this case, the court considered the fact that the AB was placed with his biological father and recognized that it was a factor that weighed against termination. Nonetheless, the court found that termination was still in AB's best interests. The court found that AB's need for protection from respondent-mother could only be adequately assured by terminating respondent-mother's parental rights. We agree. *Jones*, 286 Mich App at 129.

## 2. TV, CV, AND JV

At the time of the best-interest hearing, six year old TV, four year old CV, and one year old JV were placed together in a nonrelative licensed foster home. TV and CV had been in this home for two years. JV had been in this placement his entire life, and it was the only home he had

ever known. The evidence showed that the foster home was clean and appropriate, and the foster parents were meeting all of the children's needs. The foster parents were able to engage the children, and they were supportive, loving, and encouraging. TV was participating and progressing in therapy designed to help him process his behaviors, and was meeting his developmental milestones. CV was thriving in the foster home. Initially, she had exhibited some speech delays, but her speech had improved. CV also struggled with attachment to male adults, but she was making progress in this area as well. Similar to his siblings, JV was doing well in the foster home. Initially, he had shown some developmental delays, but he had recently completed and been discharged from occupational and physical therapy. The caseworker reported that the foster parents were interested in adopting the children should the trial court terminate respondents' parental rights.

By contrast, as discussed above, the evidence demonstrated that respondent-mother had not established the stability necessary to properly parent her children and provide them with a safe and stable home environment. Moreover, the caseworker testified that no bond existed between respondent-mother and these three children, although respondent-mother testified that she had a bond with CV and TV. When considering a child's best interests, the court may consider the advantages of a foster home over the parent's home. *Olive/Metts*, 297 Mich App at 42. Further, the trial court may consider the possibility of adoption. *White*, 303 Mich App at 713. In this case, a preponderance of the evidence supports a finding that the licensed foster home was preferable to respondent-mother's home because it would provide TV, CV, and JV with the care they required to facilitate their continued growth and development. Moreover, termination of respondent-mother's parental rights would provide an avenue by which these three children could achieve the stability, finality, and permanence they required.

The trial court did not clearly err when it found that termination of respondent-mother's parental rights was in all four children's best interests. At the end of the day, respondent-mother could not safely and appropriately care for her children, and continuing a parent-child relationship would have been detrimental to the children's physical, educational, and emotional well-being. The court properly weighed the appropriate factors when considering all of the children's best interests. On balance, a preponderance of the evidence weighed in favor of terminating respondent-mother's parental rights. Accordingly, the trial court did not clearly err in holding that termination was in her children's best interests, and in ordering the termination of respondent-mother's parental rights. *Jones*, 286 Mich App at 129.

## III. RESPONDENT-FATHER'S APPEAL (DOCKET NO. 373462)

### A. STATUTORY GROUNDS

The trial court terminated respondent-father's parental rights under the same statutory grounds it relied on to terminate respondent-mother's parental rights. Respondent-father argues that the court improperly relied on the anticipatory neglect doctrine to find statutory grounds to terminate his parental rights to TV, CV, and JV. We disagree.

Respondent-father argues that because the evidence showed that he only physically abused his stepson, AB, there was insufficient evidence for the court to conclude that there was a reasonable likelihood that his biological children would suffer injury or abuse in his care. We

disagree. For the purposes of the anticipatory neglect doctrine, the probative value of evidence of abuse or neglect of one child in anticipating the neglect or abuse of another child may be "decreased by differences between the children, such as age and medical conditions." *Kellogg*, 331 Mich App at 259; see also *LaFrance*, 306 Mich App at 730-731. However, both *Kellogg* and *LaFrance* concerned the neglect of particularly vulnerable children with special needs; this Court concluded in those cases that a parent's failure to provide specialized care or recognize the unique risks posed by a child's medical issues may not permit the inference that the parent would neglect children without those needs or vulnerabilities. *LaFrance*, 306 Mich App at 730-732; *Kellogg*, 331 Mich App at 259-261.

In this case, to the extent that respondent-father's parental rights were terminated because the trial court inferred that his children would be at risk of the same kind of abuse respondent-father perpetrated against AB, it did not err by doing so. The record shows that his children were, or with the passage of time would have soon become, similarly situated to AB. Respondent-father began abusing AB when AB was very young. The abuse occurred in the family home while the children's mother was present. Respondent-father's biological children were all under the age of four at the time of removal. The age differences between AB and respondent-father's children are not so pronounced so as to negate the probative value of respondent-father's treatment of AB. Further, although on appeal respondent-father relies heavily on the fact that AB is his stepchild, not his biological child, the record shows that respondent-father referred to AB as his son and occupied a parental role (albeit an abusive and neglectful one) in AB's life. He also testified at the best-interest hearing that the primary reason he did not inflict the same "physical discipline" upon TV and CV as he did upon AB was that TV and CV were not old enough, strongly implying that they would have received the same or similar treatment as AB in the next few years, if they had remained in respondent-father's care. Contrary to respondent-father's assertion, the evidence does not show that respondent-father treated AB differently than his biological children *because* of the lack of biological relation. Accordingly, the trial court did not err when it applied the anticipatory neglect doctrine to find that there existed statutory grounds to terminate respondent-father's parental rights to his biological children. *Trejo*, 462 Mich at 355; *Mason*, 486 Mich at 161.

In any event, there was significant evidence presented that respondent-father emotionally harmed and severely neglected TV and CV. When a respondent in a termination of parental rights case is a perpetrator of domestic violence, "the commission of domestic violence is an appropriate concern. Similarly, termination may be properly based on the fact that [a] respondent's own behaviors were directly harming the children or exposing them to harm." *In re Jackisch/Stamm-Jackisch*, 340 Mich App 326, 334; 985 NW2d 912 (2022), quoting *In re Plump*, 294 Mich App 270, 273; 817 NW2d 119 (2011) (quotation marks omitted; alteration in original). There were no allegations that respondent-father physically assaulted TV and CV; however, there was evidence that he physically abused AB in front of the younger children, and there was evidence that the children were emotionally traumatized by what they saw and heard. Accordingly, there was clear and convincing evidence that respondent-father's children were subject to emotional abuse. The harm to a child contemplated under MCL 712A.19b(3)(j) includes emotional harm as well as physical harm. *In re Sanborn*, 337 Mich App 252, 279; 976 NW2d 44 (2021). The trial court could have inferred that JV would suffer this same harm based on the treatment of his siblings. *Mason*, 486 Mich at 161; *Kellogg*, 331 Mich App at 259. Similarly, the trial court could have

-10-

based its termination on respondent-father's severe neglect of TV and CV's living environment alone, and the inference that JV would have suffered the same neglect. *Id.*

## B. RELATIVE PLACEMENT

Respondent-father also argues that DHHS failed to investigate potential relative placements before placing his children with a nonrelative licensed foster family. Specifically, respondent-father contends that the children should have been placed with Reblin, their paternal grandmother. We disagree. Statutory interpretation is a question of law that this Court reviews de novo. *In re Piland*, 336 Mich App 713, 720; 972 NW2d 269 (2021).

In support of his position, respondent-father cites to *In re Rood*, 483 Mich 73; 763 NW2d 587 (2009), and "Title IV-E" for the proposition that DHHS was required to give preference to relatives. Although respondent-father does not engage in any meaningful discussion of his cited authority, it is true that preference must be given to appropriate relatives in placing children that come into care. See MCL 722.954a(2).

In this case, the possibility of relative placement for respondent-father's children was addressed from the outset. At the September 26, 2022 adjourned preliminary hearing, counsel for respondent-father asked if the children's paternal great-grandmother, VanBlaricum, could be considered for placement. At the October 4, 2022 preliminary hearing, DHHS worker Erin Brooks testified that she had investigated for placement both VanBlaricum and Reblin. She testified that neither placement was suitable because the Washtenaw Circuit Court had ordered that VanBlaricum and Reblin could not have any contact with AB. She further explained that because of this no-contact order, it would be difficult to facilitate sibling visits if TV and CV were placed with either the grandmother or the great-grandmother. Brooks further testified that placement with Reblin was not suitable because of reports that Reblin had interfered with hospital staff attempting to question AB about his injuries. Regarding VanBlaricum, on multiple occasions during AB's and TV's prior removals, she had, at respondent-father's direction, refused to allow a CPS worker to see the children. Brooks also testified that maternal relatives had been investigated for possible placement, but that no suitable placement had been found.

The record shows that petitioner thereafter made ongoing efforts to determine whether an appropriate relative placement existed. Caseworker Dawn Cushing assessed Reblin's home on October 14, 2022. Although the home appeared physically appropriate, the caseworker recommended that respondent-father's children not be placed in Reblin's home. Cushing noted that during the investigation, a no-contact order was entered because Reblin interfered with the hospital and law enforcement investigations. Cushing also stated that during an earlier court hearing, Reblin had falsely reported that she was a licensed foster parent. Cushing asserted that Reblin did not have a current foster-care license, and she was denied a license in 2019 when TV was removed from the home. Further, Reblin reported to Cushing that she was around the children all the time. From this, Cushing believed that Reblin was aware of the abuse and the condition of the home.

Respondent-father's attorney again raised the issue of relative placement at a pretrial hearing held on October 19 and 25, 2022. At the outset, respondent-father's attorney admitted that Reblin was not, in fact, a licensed foster parent. Cushing testified that, in total, DHHS workers

successfully contacted nine relatives. Nearly all of these relatives were willing to provide short-term respite care or visits, but the overwhelming majority were not willing to take placement of the children. Multiple attempts were made to contact VanBlaricum to further discuss placement, without success. The only relative that DHHS workers were successful in contacting and investigating for placement was Reblin. Regarding Reblin, Cushing testified that DHHS had not changed its determination that placement of the children with her would not be appropriate. Cushing testified that Reblin had misrepresented that her home was licensed for foster-care when, in fact, Reblin was not and, indeed, she was denied a license in 2019. Cushing also testified that despite the no-contact order, Reblin had contact with AB at a combined sibling and parenting-time visit. The children's lawyer-guardian ad litem agreed that DHHS had fulfilled its obligation to investigate relative placement. The trial court found that DHHS reasonable efforts had been made to identify relative caregivers.

Respondent-father attempted to revisit the issue again at a November 2022 pretrial hearing. A home assessment had been made of VanBlaricum's home. The trial court stated that it was not going to change the children's placement that day, but it advised respondent-father to take the matter up with DHHS. DHHS's counsel confirmed that a home assessment was completed, that there were still some underlying issues, and that the matter should be discussed at a Family Team Meeting.

The matter of relative placement was again revisited on August 17, 2023, after respondent-father's newly appointed attorney questioned why the children were not placed with either Reblin or VanBlaricum. At this point, the children had been in the same licensed foster home for approximately one year. Cushing testified that both individuals were extensively investigated and found unsuitable for placement. Cushing reported that Reblin and VanBlaricum had both interfered with the investigation into the children's abuse and neglect.

The existing record does not support respondent-father's position that DHHS failed to properly consider placing respondent-father's children with relatives. DHHS investigated potential relatives for placement but, for several reasons, the individuals were not deemed appropriate caregivers for respondent-father's three children. We conclude that DHHS complied with its statutory obligations to explore relative placement. See MCL 722.954a(2).

Affirmed.

/s/ Christopher P. Yates
/s/ Mark T. Boonstra
/s/ Adrienne N. Young